# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

June 17, 2021

Honorable Ronnie Abrams
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

Application denied.

SO ORDERED.

Ronnie Abrams, U.S.D.J.
June 21, 2021

Re: **United States v. Adam Marrero,
18 Cr. 829 (RA) (S.D.N.Y.)**

Dear Judge Abrams:

We write on behalf of Adam Marrero in the above-captioned matter to respectfully request, pursuant to 18 U.S.C. § 3583(e)(1) and Federal Rule of Criminal Procedure 32.1(c)(2)(B), that the Court terminate the remaining six months of Mr. Marrero's term of supervised release in light of Mr. Marrero's success on supervision, the extremely harsh conditions of his prior term of incarceration, his significant and mounting health issues, and his desire to relocate to Florida to be closer to his children and grandchildren.

Mr. Marrero has completed approximately 18 months of the 24-month term of supervised release the Court imposed in August 2019 after an earlier violation of Mr. Marrero's supervised release. The Government and Probation Department oppose the instant request.

## I.    Background

In 2018, Mr. Marrero pleaded guilty to conspiracy to impersonate an officer or employee of the United States and to conspiracy to commit wire fraud in violation of 18 U.S.C. § 371 and 18 U.S.C. § 1349, respectively. On March 1, 2019, the Court sentenced Mr. Marrero to three months' incarceration (to be served in a Residential Reentry Center) and three years of supervised release, three months of which was to be served in home confinement. (Doc. 31 at 1–2.)

On August 15, 2019, the Court sentenced Mr. Marrero to four months of incarceration and 24 months of supervised release (90 days of which to be served on home confinement) in connection with Mr. Marrero's violation of his original term of supervised release (for use of a controlled substance and discharge from his RRC). (Doc. 38 at 1–2.) Mr. Marrero was incarcerated from August 29, 2019 to December 29, 2019.

United States v. Adam Marrero,
18 Cr. 829 (RA) (S.D.N.Y.)

## II.     Mr. Marrero's Arduous Term of Incarceration and Medical Complications

In recognition of Mr. Marrero's significant medical issues, at his August 2019 sentencing, Your Honor directed that Mr. Marrero continue to receive in prison the medication he was taking to treat and manage his diabetes and psychiatric conditions. Specifically, the Court recommended that Mr. Marrero continue to receive his insulin (for diabetes), Prazosin (for high blood pressure), Trazadone (for depression and anxiety), and Olanzapine (to treat bipolar disorder). (Doc. 38 at 2.)

Notwithstanding the Court's direction and Mr. Marrero's repeated requests for this medication, Mr. Marrero did not receive any psychiatric medication and was only provided insulin on a handful of occasions during his four months of incarceration. Mr. Marrero—who had been taking his psychiatric medications daily and his insulin three times a day before his incarceration—experienced severe complications from this lack of medical treatment.

As recounted in Mr. Marrero's enclosed letter to the Court, to control his blood sugar and avoid a diabetic crisis in the absence of regular insulin treatment, Mr. Marrero forced himself to only eat sporadically, at most one meal every other day. Lacking access to his psychiatric medication, Mr. Marrero also mentally decompensated and suffered greatly from conditions for which he had worked diligently to receive treatment. After a few weeks in general population, Mr. Marrero was moved to protective solitary confinement, where he remained for about three months. Mr. Marrero's isolation in prison only worsened the negative effects of his lack of psychiatric medication.

Mr. Marrero remained in solitary confinement until December 2, 2019, when, after eating a meal provided to him in his cell, he lost consciousness, fell, and hit his head and neck on his bed frame. Correctional staff removed him to a medical unit before transporting him to the hospital. Mr. Marrero was advised by a doctor that he had contracted a virus from tainted food (likely containing rat feces). Mr. Marrero sustained a fracture to his neck. Mr. Marrero's health was so severely compromised by this virus, physical injury, and lack of diabetes treatment that he spent the remaining four weeks of his term of incarceration in the hospital.

Upon his release from the hospital, Mr. Marrero's doctors advised him that he could have died from a diabetic crisis and further diagnosed him with pulmonary ailments, including a lung infection Mr. Marrero contracted either while incarcerated or as a result of the medical treatment he received while incarcerated. Mr. Marrero remains under the care and direction of a pulmonologist (with whom he meets once a month) and an endocrinologist (with whom he meets twice a month). Unfortunately, Mr. Marrero has also needed to make frequent visits to the emergency room in response to severe respiratory events, and he continues to need a range of medications to manage his diabetes, high blood pressure, pulmonary issues, and mental health. The COVID-19 pandemic exacerbated Mr. Marrero's health concerns, as he has several high-risk factors that increase the likelihood of disastrous outcomes from COVID-19.

United States v. Adam Marrero,
18 Cr. 829 (RA) (S.D.N.Y.)

### III.    Mr. Marrero's Success on Supervision

Despite his medical challenges, Mr. Marrero has succeeded on supervision since his
release in late 2019. He has remained employed since his release from custody and currently
works at Podcasts Business News Network as a salaried employee. Mr. Marrero has satisfied his
restitution obligations in this case and paid the necessary court and supervision fees.

Since his violation in 2019, Mr. Marrero has also complied with the terms of his release.
He has obeyed the law and his Probation Officer's instructions.[1] He communicates with his
Probation Officer frequently and reports for drug testing as required. In light of his history of
compliance, in April 2021, Mr. Marrero's Probation Officer granted his request to travel to
Orlando, Florida so that he could attend his son's wedding.

### IV.    Mr. Marrero Wishes To Relocate to Florida To Be Nearer to His Family

At his sentencing for the underlying criminal offenses, Mr. Marrero disclosed to the
Court that he wished to move back to Florida, where he had lived for 20 years, so that he could
be a more involved father and grandfather to his growing family. (Mr. Marrero currently has four
children and six grandchildren who live in the Orlando, Florida region.) Your Honor
acknowledged Mr. Marrero's request and made an on-the-record recommendation that his period
of supervision be transferred to the Middle District of Florida upon Mr. Marrero's release from
home confinement. (*See* Doc. 32 at 16:13–17:6.) Based on conversations with Probation
regarding a transfer of Mr. Marrero's remaining term of supervision to Florida, the undersigned
understands such a transfer is not assured because of, among other complications, the number of
individuals who wish to have their supervision transferred to Florida.

Since his original sentencing, as described above, Mr. Marrero's health has unfortunately
declined further and he has required additional assistance and care. Recently, Mr. Marrero's
pulmonologist recommended that he undergo a bronchoscopy. His doctor has also advised Mr.
Marrero that the neck injury he sustained while incarcerated will require a risky, complicated
surgery. These procedures have yet to be performed, however, because Mr. Marrero does not
have anyone in New York who can provide care for him during the recovery period.

In anticipation of this request, Mr. Marrero has already interviewed for and been granted
a request to transfer his employment to his employer's Orlando office. He has also obtained
referrals for new doctors and medical specialists in Orlando from his current doctors and has
found a new therapist in the area. Mr. Marrero has also located housing for which he is prepared
to submit a security deposit, if permitted to do so.

---

[1]    Mr. Marrero was recently given a citation and charged with driving with a suspended license
in connection with a routine traffic violation. Mr. Marrero promptly self-reported this
incident to his Probation Officer, who issued a letter of reprimand, but not a violation of
supervised release.

United States v. Adam Marrero,
18 Cr. 829 (RA) (S.D.N.Y.)

## V.      The Court Should Terminate Mr. Marrero's Supervised Release

"'Supervised release is not, fundamentally, part of the punishment; rather, its focus is rehabilitation.'" *United States v. Bethea*, No. 05 Cr. 1234 (DC), 2015 WL 13776431, at *1 (S.D.N.Y. Dec. 7, 2015) (quoting *United States v. Aldeen*, 792 F.3d 247, 252 (2d Cir. 2015)). "Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000).

After considering the after considering the Section 3553(a) factors, the Court may terminate a term of supervised release if the defendant has completed a year of supervision and if the Court "is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e)(1). Early termination is appropriate when "exceptionally good behavior by the defendant . . . render[s] a previously imposed term . . . of release either too harsh or inappropriately tailored to serve the general punishment goals of section 3553(a)." *United States v. Lussier*, 104 F.3d 32, 36 (2d Cir. 1997); *see United States v. Rasco*, No. 88 Cr. 817 (CSH), 2000 WL 45438, at *2 (S.D.N.Y. Jan. 19, 2000). Courts have wide discretion in whether and why to order termination of supervised release. For example, in *United States v. Harris*, the court granted early termination because there was no need for further general deterrence and supervised release posed "multi-faceted obstacles" to the defendant advancing in his career. 689 F. Supp. 2d 692, 695–96 (S.D.N.Y. 2010).

Here, termination of Mr. Marrero's supervised release six months earlier than scheduled is warranted in light of Mr. Marrero's demonstrable rehabilitation, success on supervision, mounting health issues, and the disproportionate punishment he received as a result of his 2019 violation of supervised release.

As Mr. Marrero's continued employment (and employer approval to move offices) demonstrates, he has adjusted well to supervision. He has used his earnings to satisfy all his obligations to the Court and victims. He continues to repair his relationships with his family members and—with the exception of his recent traffic incident—remains in full compliance with the law. In short, Mr. Marrero is not in need of further supervision for purposes of rehabilitation.

We understand that Probation opposes early termination given Mr. Marrero's previous violation of supervised release. But Mr. Marrero has already been (disproportionately) punished for that violation and has been compliant with the terms of his supervision since his term of incarceration. The prior violation should not be an insurmountable barrier to early termination of the term of supervised release the Court imposed as a sentence for that violation.

Moreover, as noted above, Mr. Marrero's declining health is a changed condition that the Court could not have appreciated at the time of his August 2019 sentencing, when it imposed a term of two years of supervised release.

Finally, as recounted above, Mr. Marrero suffered through a horrific term of incarceration in 2019. While it was certainly not the Court's intention that Mr. Marrero be incarcerated in such extreme conditions, be placed in solitary confinement for months, and be denied essential medical care, unfortunately, this is what came to pass. As numerous courts in this District have

United States v. Adam Marrero,
18 Cr. 829 (RA) (S.D.N.Y.)

done in imposing downward variances at sentencing, in reducing sentences, and in granting compassionate release applications in light of the harsh conditions of confinement for individuals in BOP facilities during the COVID-19 pandemic and lockdowns at MDC and MCC, we respectfully submit that the Court should take into consideration the conditions of Mr. Marrero's incarceration after his 2019 violation, which made every day he served in prison much more punishing than it should have been. *Cf., e.g.*, *United States v. Cirino*, No. 19 Cr. 323 (JSR) (S.D.N.Y.), Sent'g Tr. 11:11–15 (July 17, 2020) ("[I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons."); *United States v. Aracena de Jesus*, No. 20 Cr. 19 (PAE) (S.D.N.Y.), Sent'g Tr. 37:6–11 (July 1, 2020) ("Bottom line, your time in the MCC was way harder than anyone intended when you were detained following your arrest.").

\*       \*       \*

For the foregoing reasons, we respectfully request that the Court terminate Mr. Marrero's term of supervised release.

Respectfully submitted,

/s/ Neil Kelly

Neil P. Kelly
Assistant Federal Defender
Tel: (212) 417-8744

Enclosure

cc:     AUSA Peter John Davis (by ECF)
        Heather Clark, United State Probation Officer Assistant (by email)

# EXHIBIT A

June 16, 2021

Honorable Ronnie Abrams
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Abrams:

I am writing to request early termination of my supervised release. In the time since I committed my offense, I have reflected on the kind of life I want to lead. I want to live free of trouble with the law. Being on supervised release and serving four months in prison for a violation showed me how much I value my freedom and how I must show good judgment to keep it. The things that matter most-my children and grandchildren and my health-have become even more important to me over the past years. I want to move to Orlando, Florida to be closer to my family, who will help take care of me as I age and deal with health issues, and to be further from the environment in which I have made mistakes. I understand transfer is not a guarantee.

I had a terrible experience while incarcerated and this has also helped deter me from ever committing a crime. I do not believe I would survive incarceration again. I turned myself in to the marshals on August 29, 2019. I spent 30 days in general population. In that time, I saw a psychiatrist a single time. I did not get the weekly sessions I should have received. They gave me my insulin twice in four months. I starved myself to regulate my blood sugar and avoid a diabetic crisis. I did not receive my psychiatric medications a single time. I was placed in solitary confinement because other inmates threatened me. On December 2, I was given food that gave me food poisoning. I later found out at the hospital that the food contained rat feces. I banged on the cell door with severe stomach pain. I got up to wash my face and fell back, hitting the metal frame of my bed. I blacked out. I was taken to the hospital with a fracture on my neckbones. I served the rest of my time in a hospital bed. I still suffer from neck issues and attend physical therapy. I have also developed pulmonary issues as a result of not having access to insulin for so long, and my mental health got worse during my incarceration. My doctor told me that I could have died without insulin. I do not want to do anything that may put me back in those conditions.

After my release, I got a job at Podcasts Business News Network and paid off my restitution in full. I wanted to tie up any loose ends so that I could move to Florida. Your Honor told me at my sentencing that it would not be a problem for me to move to Florida. As such, I've saved money to relocate and find housing in Florida and even requested a transfer to my job's Orlando office. I have also found a pulmonologist, endocrinologist, and therapist in Orlando. I am currently waiting to receive surgery to correct my neck injury, which requires a long and complicated recovery, as well as a bronchoscopy. I hope to be in Florida when I undergo these procedures so that my children can care for me during the recovery.

Sincerely,

Adam Marrero